**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**BELGRAVIA HARTFORD CAPITAL, INC., and BELGRAVIA HARTFORD GOLD ASSETS CORP.,**

**Plaintiffs,**

**v.** **No. 1:25-cv-00119-JCH-KK**

**STINSON, LLP, PAUL LACKEY, ESQ., and SNELL & WILMER L.L.P.,**

**Defendants.**

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court a second time. Plaintiffs Belgravia Hartford Capital, Inc. ("Belgravia Capital") and Belgravia Hartford Gold Assets Corp. ("Belgravia Gold") (collectively, "Belgravia" or "Plaintiffs") sued their prior counsel, Paul Lackey, and his firm Stinson, LLP, (collectively, the "Stinson Defendants") as well as Snell & Wilmer, L.L.P., ("Snell") for legal malpractice arising from their actions related to the underlying case of *Belgravia v. PolyNatura*, No. 2:21cv-00918-MIS-JHR (D.N.M.) ("*PolyNatura* Lawsuit"). The Stinson Defendants filed a *Motion to Compel Arbitration and Stay Proceedings* (Dkt. No. 3), which this Court granted on October 14, 2025. Mem. Op. and Order 16, Dkt. No. 49 (hereinafter "*Order Compelling Arbitration*"). The Court referred Plaintiffs' claim to arbitration and stayed the case pending the conclusion of the arbitration proceedings. On March 17, 2026, Plaintiffs filed a *Motion for Reconsideration, or in the Alternative, for Clarification of the October 14, 2025 Order* (Dkt. No. 56). The Court, having considered the motion, briefs, evidence, and relevant law, and upon further reflection, concludes that the motion to reconsider should be granted for the reasons given herein.

## I. BACKGROUND

### A. Colorado Litigation Resulting in Royalty Agreement

Plaintiffs hired Snell around May 8, 2017, as its legal counsel related to their investments in mining assets and mineral rights connected to a Polyhalite deposit in New Mexico. *See* First Am. Compl. ("FAC") ¶ 10, Dkt. No. 20-3. Lawsuits followed in both Colorado and New York. *See* Settlement Agreement 1, Dkt. No. 30-1. As part of the settlement of both suits, Snell negotiated and drafted a settlement agreement in September 2017 as well as a Royalty Agreement, granting Belgravia royalty rights tied to the mine. *See id.*; FAC ¶ 11, Dkt. No. 20-3.

### B. New Mexico Litigation to Enforce Settlement and Royalty Agreements

In September 2021, at Snell's recommendation, Belgravia filed the *PolyNatura* Lawsuit, a case concerning the Royalty Agreement. FAC ¶ 15, Dkt. No. 20-3. Snell served as lead counsel for Belgravia in the case until it voluntarily withdrew as counsel, effective September 7, 2022. *Id.* ¶¶ 15, 19.

After hiring and firing another law firm, Belgravia hired Stinson and Lackey as lead counsel to represent it in the *PolyNatura* Lawsuit. *See id.* ¶¶ 17-24. On or about December 13, 2022, Plaintiffs and Stinson entered into a written engagement agreement ("Legal Services Contract"). Moheban Decl. ¶ 3, Dkt. No. 4. Under the "**Fees and Charges**" section, the Legal Services Contract said: "PLEASE NOTE THAT THE GENERAL TERMS OF REPRESENTATION THAT WE ASK YOU TO AGREE TO INCLUDE A PROVISION CONCERNING MANDATORY BINDING ARBITRATION OF ANY DISPUTES ABOUT OUR FEES OR OTHER CHARGES." Legal Services Contract, Dkt. No. 4-1 at 2 of 8. The agreement further stated that the provision was included "to resolve any such disputes quickly, efficiently and in a less public forum than in court, but it does cause both parties to give up rights that they would

otherwise have to bring an action in court." *Id.* It also advised the client to seek separate counsel about whether to agree to the arbitration provision. *Id.*

Mehdi Azodi, President of Belgravia, signed page four of the agreement after Lackey told him it was a "simple, standard agreement." Azodi Decl. ¶¶ 2, 6, 8, Dkt. No. 29-1. Lackey did not explain or mention the arbitration clause, and Mr. Azodi signed the agreement without consulting independent counsel. *Id.* ¶¶ 9, 11.

Beginning on page five of the agreement were the General Terms of Representation. Legal Services Contract, Dkt. No. 4-1 at 5 of 8. On page seven, the General Terms set forth, among other things, the arbitration provision under the heading "RESOLUTION OF DISPUTES CONCERNING FEES AND OTHER CHARGES" (hereinafter "Arbitration Agreement"). *Id.* at 7 of 8. The provision read:

> ANY CLAIM, CONTROVERSY OR DISPUTE, WHETHER SOUNDING IN CONTRACT, STATUTE, OR TORT, OR ANY OTHER LEGAL THEORY, RELATED DIRECTLY OR INDIRECTLY TO THE FEES OR OTHER CHARGES BY OUR FIRM TO YOU, INCLUDING, BUT NOT LIMITED TO YOUR NON-PAYMENT OF ANY AMOUNTS BILLED TO YOU, SHALL BE RESOLVED BY MANDATORY BINDING ARBITRATION AS PRESCRIBED IN THIS SECTION. THE FEDERAL ARBITRATION ACT, NOT STATE LAW, GOVERNS THE ARBITRATION, INCLUDING BUT NOT LIMITED TO THE QUESTION OF WHETHER A CLAIM IS SUBJECT TO ARBTRATION. YOU AND OUR FIRM EACH AGREE TO WAIVE ANY RIGHT TO TRIAL IN A COURT OF LAW AND ANY RIGHT TO A TRIAL BY JURY THAT MAY OTHERWISE EXIST.

*Id.* The Arbitration Agreement further stated that the arbitration would be administered by the American Arbitration Association ("AAA"), and each party would give up rights they would otherwise have. *Id.* As it explained:

> BY AGREEING TO THIS PROVISION, YOU WAIVE YOUR RIGHT TO BRING AN ACTION IN COURT, AND TO HAVE A JURY TRIAL, AND YOUR RIGHT TO AN APPEAL. IN MOST CIRCUMSTANCES, THE DECISION OF THE ARBITRATOR IS FINAL AND MAY NOT BE APPEALED OR CHALLENGED, EXCEPT ON VERY LIMITED GROUNDS. DISCOVERY (THE PARTIES'

> RIGHT TO OBTAIN INFORMATION FOR EACH OTHER AND THIRD PARTIES) IS OR MAY BE LIMITED OR PRECLUDED IN ARBITRATION…. IF YOU HAVE ANY QUESTIONS ABOUT ARBITRATION OR WHETHER YOU SHOULD AGREE TO THIS PROVISION, SEEK INDEPENDENT LEGAL ADVICE OR ASK THAT THIS PROVISION BE DELETED FROM OUR AGREEMENT WITH YOU BEFORE YOU SIGN IT.

*Id.* The agreement next said: "THIS PROVISION SHALL NOT APPLY IN ANY JURISDICTION IN WHICH IT DOES NOT COMPLY WITH THE RULES OF PROFESSIONAL CONDUCT APPLICABLE TO ATTORNEYS." *Id.*

Lackey appeared in the *PolyNatura* Lawsuit in February 2023. *See PolyNatura* Lawsuit, Notice (Dkt. No. 77). He withdrew in May 2023. Order on Mot. for Withdrawal, *PolyNatura* Lawsuit, Dkt. No. 87.

Since the filing of the motion to reconsider, the *PolyNatura* Lawsuit ended. *See PolyNatura* Lawsuit. Having previously granted summary judgment to PolyNatura Corp. on three claims, on March 19, 2026, the Honorable Margaret I. Strickland granted PolyNatura Corp.'s motion to dismiss the last claim and entered Final Judgment. *See* Order, Final J., & Order 2, *PolyNatura* Lawsuit, Dkt. Nos. 286, 287, & 312. Belgravia Gold filed a motion to reconsider the dismissal order. Mot. to Reconsider, *PolyNatura* Lawsuit, Dkt. No. 288. On July 23, 2026, Judge Strickland granted the motion to reconsider only to the extent that she amended the *Order Granting Defendant's Motion to Dismiss* to read that Plaintiff's claims for damages resulting from the breach of § 7 of the Royalty Agreement is moot and dismissed without prejudice, but otherwise she denied the motion to reconsider. *See* Order at 7, *PolyNatura* Lawsuit, Dkt. No. 312.

### C. The Arbitration

In January 2024, Stinson filed an arbitration action, *Stinson, LLP v. Belgravia Hartford Capital, Inc. and Belgravia Hartford Gold Assets Corp.*, AAA Arbitration No. 1-24-0000-2991 ("the Arbitration") for unpaid legal work performed on matters relating to the *PolyNatura* Lawsuit.

*See* Moheban Decl. ¶ 5, Dkt. No. 4; Arbitration Claim, Dkt No. 4-2. The parties proceeded in arbitration, with Belgravia filing a response denying the claim and asserting counterclaims for breach of the covenant of good faith and fair dealing implicit in the contract and breach of fiduciary duty. *See* Statement of Counterclaims, Dkt. No. 4-3. Belgravia alleged in its breach of contract claim that Stinson excessively, unreasonably, and unconscionably overbilled for unnecessary work. *Id.* at 3-4. They also contended that counsel had promised to do certain work, but failed to, and that counsel missed discovery deadlines. *Id.* at 4-5. In support of their breach of fiduciary duty claim, Belgravia alleged that Stinson charged excessive fees, failed to be candid about the merits and scope of the *PolyNatura* Lawsuit, failed to do work it promised to do, and failed to advance the litigation meaningfully. *Id.* at 5. Belgravia sought disgorgement of legal fees paid. *Id.* The arbitration was scheduled for a final hearing on January 14, 2025. Moheban Decl. ¶ 7, Dkt. No. 4.

On December 2, 2024, Belgravia moved to abate and continue the final hearing in the arbitration proceeding until resolution of the *PolyNatura* Lawsuit. *Id.* ¶ 9; Mot. to Abate 1, 18, Dkt. No. 4-6. In the motion, Belgravia stated:

> Belgravia denies any obligation to pay the outstanding invoices and asserts defenses and counterclaims related to Stinson's mishandling of the case and breaches of its contractual and fiduciary duties to Belgravia. The law is well established that an attorney's alleged malpractice, whether through negligence or breach of fiduciary duty, is central to a client's defenses against an attorney's fee claims, and indeed functions both as a compulsory counterclaim and a defense to a suit for recovery of attorney's fees. Consequently, the successful resolution of Belgravia's defenses and counterclaims could entirely negate Stinson's claim for fees.

Pls.' Mot. to Abate 2, Dkt. No. 4-6. Belgravia argued, however, that because the *PolyNatura* Lawsuit was ongoing, their "defenses and counterclaims concerning Stinson's representations are not yet ripe." *Id.* It continued, "Simply put, the Arbitrator could not fully address the merits of this dispute without conclusion of the Underlying Litigation, which, once resolved, would clarify and streamline the issues and claims in this arbitration." *Id.* As Belgravia explained,

> Belgravia has asserted affirmative defenses and counterclaims stemming from Stinson's mishandling of that very same litigation for which fees are sought….
>
> Stinson's recovery of any fees it claims are owed in this Arbitration hinges entirely on the resolution of Belgravia's counterclaims and defenses….
>
> Stinson's fee claim, Belgravia's defenses, and Belgravia's counterclaims are thus inextricably intertwined, arising from the same core operative facts: Stinson's representation of Belgravia in the Underlying Litigation. Under Texas law, Belgravia's claims regarding Stinson's mishandling of the Underlying Litigation are *compulsory counterclaims which must be adjudicated alongside Stinson's fee claim*…. New Mexico courts similarly hold that malpractice claims arising from a law firm's representation are compulsory counterclaims to fee disputes.

*Id.* at 6-7 (italics emphasis added) (citing, among other cases, *Brunacini v. Kavanagh*, 869 P.2d 821, 829 (N.M. App. 1993)). Belgravia further argued: "The Arbitrator cannot address the merits of Belgravia's defenses and counterclaims concerning Stinson's representation—which directly impact Stinson's entitlement to fees—until the underlying litigation is resolved." *Id.* at 8.

Stinson opposed the motion to abate the arbitration, arguing that the motion was belatedly filed only a month before the scheduled arbitration and disputing Belgravia's assertions that they had pled counterclaims for malpractice or negligence. Defs.' Ex. H at 1, 7-10, Dkt. No. 34-2; Def.'s Ex. I, Dkt. No. 34-3. Because Belgravia had only requested a remedy for the disgorgement of legal fees paid, Stinson contended that Belgravia had not requested any sort of relief arising from malpractice that would compel the need to abate the arbitration. *See* Defs.' Ex. H at 4, Dkt. No. 34-2. Stinson additionally noted that any illusory malpractice claims had not matured because judgment had not yet been entered in the underlying litigation. *Id.* at 10 n.2.

The arbitrator denied Belgravia's motion to abate. Defs.' Ex. I, Dkt. No. 34-3. At the hearing on the motion, the arbitrator stated that Belgravia had not asserted malpractice claims in the arbitration, but the arbitrator did not rule on whether the malpractice claims were outside the scope of the arbitration. Moheban Supp. Decl. ¶ 5, Dkt. No. 34-4.

### D. New Mexico Legal Malpractice Lawsuit

Despite having weeks before argued that the malpractice claims were not ripe until the *PolyNatura* Lawsuit finished, on December 23, 2024, Belgravia sued Stinson and Lackey for legal malpractice, negligent and intentional misrepresentation, and violation of the Unfair Trade Practices Act in New Mexico state court. *See* Compl. 1, Dkt. No. 1-2 at 6-7 of 15. The Stinson Defendants thereafter notified the arbitrator of the case and requested that the arbitration be stayed while they pursued a motion to compel. Moheban Decl. ¶ 12, Dkt. No. 4. Belgravia subsequently filed an amended complaint, adding Snell as a defendant. FAC, Dkt. No. 1-4. Stinson and Lackey removed the case based on diversity jurisdiction. Notice of Removal 1-2, Dkt. No. 1; Consent Notice 1-3, Dkt. No. 20.

### E. Motion to Compel Arbitration

The Stinson Defendants then filed a *Motion to Compel Arbitration and Stay Proceedings* (Dkt. No. 3) under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, seeking a stay of this case and an order compelling Plaintiffs to continue to proceed in the existing arbitration. They argued that Belgravia is barred from proceeding in this Court because of the binding arbitration agreement between them, yet Belgravia brought this action after they were unsatisfied with rulings made by the arbitrator. Defs.' Mot. to Compel 3, Dkt. No. 3. In support of their argument that Plaintiffs knew the legal malpractice claims are directly or indirectly related to the fee claims, the Stinson Defendants cited Plaintiffs' own arguments in their motion to abate in which Plaintiffs asserted that their malpractice claims are compulsory counterclaims that must be adjudicated alongside the fee claim. *Id.* at 10-11. In doing so, the Stinson Defendants contended that Plaintiffs admitted that the claims fell within the scope of the arbitration provision. *Id.* In their motion, however, the Stinson Defendants did not assert or cite waiver law. *See id.* at 1-14.

Plaintiffs countered that the motion should be denied because their pleading raises legal malpractice, negligent/intentional misrepresentation, and Unfair Trade Practices claims that do not fall within the scope of the arbitration clause that is limited to fee-disputes. *See* Pls.' Resp. 2-3, 8-10, Dkt. No. 29. They further asserted that the arbitration clause violates New Mexico public policy because the Stinson Defendants failed to obtain Belgravia's informed consent concerning the scope and effect of the agreement and the rights the client was waiving. *See id.* at 10-15. Finally, Plaintiffs argued that the arbitration provision is unenforceable based on procedural and substantive unconscionability. *Id.* at 15-17. Plaintiffs did not directly address the statements they made in their motion to abate. *See id.* at 1-20. Instead, they argued that the malpractice claims were unripe and could not have been brought as compulsory counterclaims in the arbitration. *Id*. at 18.

For the first time in their reply, the Stinson Defendants argued, with citation to authority, that Plaintiffs by their conduct waived any challenge to the validity of the arbitration agreement by participating in the arbitration and claiming to have asserted malpractice claims. *See* Defs.' Reply 6, Dkt. No. 34. They further contended that the malpractice claims indirectly relate to fees and charges and are compulsory counterclaims to the fee-claims, and therefore, fall within the scope of the arbitration clause. *Id.* at 8.

In response to the motion to compel, Snell, who is not a party to the arbitration agreement, requested a stay of the case until both the arbitration and the *PolyNatura* Lawsuit were resolved. Snell's Resp. 1, Dkt. No. 26. Snell argued that a stay would allow both matters to proceed and streamline issues in this case. *Id.* at 4. Snell urged the Court to exercise its inherent authority to stay proceedings for judicial economy. *Id.* at 4-9.

### F. October 14, 2025, Memorandum Opinion and Order

On October 14, 2025, this Court entered its *Order Compelling Arbitration*. Mem. Op. and Order 15, Dkt. No. 49. Recognizing that the arbitrator agreed with the Stinson Defendants' argument that Belgravia had not asserted malpractice claims in the arbitration, the Court nonetheless focused on "the fact that Belgravia attempted to benefit from the arbitration agreement by asserting malpractice claims as compulsory counterclaims in the arbitration and arguing that the claims should be tried alongside the fee dispute." *Id.* As the Court explained:

> Even assuming Belgravia is correct that their malpractice claims do not fully ripen until the PolyNatura litigation concludes, Belgravia was seeking to abate the arbitration. It asserted that its malpractice defenses and counterclaims should be adjudicated along with the fee claim *in the arbitration*, just at a later time. It thus invoked the benefits of the arbitration provision. Belgravia's prior position is at odds with its current positions claiming that the malpractice claims are outside the scope of the arbitration provision in the contract and are invalid.

*Id.* at 12-13. The Court therefore concluded that "waiver and estoppel rules apply to preclude Belgravia from now arguing that their malpractice claims fall outside the scope of the arbitration agreement and that the arbitration agreement is invalid." *Id.* at 13. Pursuant to 9 U.S.C. § 3, the Court compelled arbitration and stayed the case until the arbitration concludes. *Id.* at 15. It declined to consider whether the case should be stayed until the *PolyNatura* Lawsuit finished, as the request might be moot. *See id.* The Court noted that neither Plaintiffs nor the Stinson Defendants addressed whether the case should be stayed until the underlying litigation concluded. *Id.*

**G. Belgravia's Appeal and Motion to Reconsider**

Belgravia appealed the *Order Compelling Arbitration*. Notice of Appeal, Dkt. No. 50. After the Stinson Defendants threatened sanctions because the interlocutory order was not appealable, Belgravia voluntarily dismissed the appeal. *See* Pls.'s Mot. 7, Dkt. No. 56; Stinson Defs.' Resp. 3-4, Dkt. No. 59; Order, Dkt. No. 53-1. The Tenth Circuit's mandate issued on December 2, 2025. *See* Mandate, Dkt. No. 53.

On March 17, 2026, Belgravia requested that the Court reconsider its *Order Compelling Arbitration* based on misapprehending Belgravia's position and the controlling law. *See* Pl.'s Mot. to Reconsider ("MTR") 5, Dkt. No. 56. Alternatively, Plaintiffs ask the Court to "clarify that participation in the fee-only AAA proceeding will not constitute waiver of malpractice claims, that fee-only findings will not have preclusive effect on malpractice claims (which may proceed in this court), and that the AAA fee arbitration be stayed pending resolution of this motion." *Id.* at 27. As another alternative, Belgravia seeks certification for interlocutory appeal under 28 U.S.C. § 1292(b). *Id.* at 4. The Stinson Defendants and Snell oppose the motion to reconsider. *See* Stinson Defs.' Resp., Dkt. No. 59; Snell's Resp., Dkt. No. 60.

## II. STANDARD

An interlocutory order "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). A motion for reconsideration of an interlocutory order invokes the district court's discretionary authority. *See Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1223 n.2 (10th Cir. 2008); *Price v. Philpot*, 420 F.3d 1158, 1167 n.9 (10th Cir. 2005) ("every order short of a final decree is subject to reopening at the discretion of the district judge") (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 (1983)). A motion to reconsider is generally not an appropriate vehicle to advance arguments that could have been raised in prior briefing. *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). Rather, grounds for granting a motion to reconsider include when the court has misapprehended the facts, a party's position, or the controlling law or where there is new evidence previously unavailable. *Id.*

## III. ANALYSIS

According to Belgravia, the rulings of the arbitrator and this Court leave them without a forum to consider their malpractice claims. MTR at 7-8, Dkt. No. 56. They contend that the *Order Compelling Arbitration* rests on a "fundamental legal error" in finding that Belgravia waived the right to litigate malpractice claims that did not yet exist. *Id.* at 2. Further, they argue the Court erred in applying waiver/estoppel to a denied motion, as the estoppel doctrine requires that the party succeed in persuading a tribunal to accept the prior position. *Id.* at 3. As for the stay of the claims against Snell, Belgravia asserts that the Court neglected to conduct the requisite discretionary-stay analysis and should lift the stay and allow those claims to proceed. *See id.* The Court will begin its analysis with the latter argument first.

**A. Court will lift stay of litigation against Snell.**

Relying on *Riley Mfg. Co., Inc. v. Anchor Glass Container Corp.*, 157 F.3d 775, 785 (10th Cir. 1998), Belgravia argues that the *Order Compelling Arbitration* stayed claims against Snell without the requisite discretionary-stay analysis. Snell counters that Plaintiffs are merely re-raising the same issues as the prior briefing and have not met the standard for reconsideration.

Section 3 of the Federal Arbitration Act ("FAA") mandates a stay of a case where an issue "is referable to arbitration." 9 U.S.C. § 3. When considering whether to grant a stay as to a non-arbitrating party, the district court may consider judicial efficiency and controlling its docket. *See Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1518 (10th Cir. 1995). Where non-arbitrable claims remain subject to litigation, a court should also consider whether resolution of the arbitrable claims will have preclusive effect on the non-arbitrable claims. *Riley Mfg.*, 157 F.3d at 785. If there will be a preclusive effect, especially where the arbitrable claims predominate, then the district court should consider staying the federal-court litigation pending the outcome of arbitration. *Id.* "On the other hand, the mere fact that piecemeal litigation results from the

combination of arbitrable and nonarbitrable issues is not reason enough to stay [the] entire case." *Id. See also Coors Brewing Co.*, 51 F.3d at 1517 (10th Cir. 1995) ("[T]he Supreme Court has held that litigation must proceed in a 'piecemeal' fashion if the parties intended that some matters, but not others, be arbitrated.") (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985)).

Turning to the claims against Snell, Belgravia's claims are indisputably not subject to arbitration because Belgravia and Snell never entered an agreement to arbitrate. Having reviewed its decision, the Court gave insufficient analysis to why it stayed the case against Snell. Based on *Riley*, more is required.

Snell argues that, because Plaintiffs are a party to the arbitration, it could use findings from the arbitration as non-mutual offensive collateral estoppel. *See* Snell's Resp. 10, Dkt. No. 60. Collateral estoppel, also known as issue preclusion,

> precludes a court from reconsidering an issue previously decided in a prior action where (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*B-S Steel v. Texas Indus., Inc.*, 439 F.3d 653, 662 (10th Cir. 2006). Issue preclusion here fails on the first step. The fee dispute in the arbitration between Belgravia and the Stinson Defendants is unlikely to have preclusive effect on the claims against Snell. Although Snell indicates that the findings in the arbitration may bind Plaintiffs, it identifies no specific facts that may arise in the arbitration of the fee dispute brought by the Stinson Defendants that could constrain Plaintiffs as to an issue involving Snell. There is limited overlap between the issues raised in the arbitration proceedings regarding the reasonableness and propriety of the fees charged by the Stinson Defendants and the litigation against Snell about whether it breached the standard of care in its

earlier, separate representation of Plaintiffs. Nor do the issues in the arbitration predominate. The preclusive-effect factor weighs against a stay of the case under *Riley*.

Additionally, a stay is no longer warranted under the Court's inherent power. *See Landis v. North American Co.*, 299 U.S. 248, 254 (1936) ("the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants"). At the time the Court entered the stay, the *PolyNatura* Lawsuit was ongoing. Because resolution of that lawsuit might clarify and streamline the issues in this case, a stay would cause minimal prejudice to Plaintiffs. Now, however, the *PolyNatura* Lawsuit is complete. Judicial economy no longer favors a stay. Nor is the Court persuaded that a stay may narrow the issues in this case in a meaningfully sufficient manner or avoid inconsistent results to justify the delay. The rules favor the just and speedy resolution of cases. *See* Fed. R. Civ. P. 1. Snell's representation ended in September 2022, approximately four years ago. Plaintiffs may suffer prejudice from a continued lengthy stay based on the potential of fading memories of witnesses. Accordingly, given the changed circumstances, the need to preserve evidence, and the general right to proceed in court, the Court grants the motion to reconsider the stay of the case against Snell and will lift the stay as to those claims.

**B. Court erred in compelling arbitration of malpractice claims based on waiver.**

In its Memorandum Opinion and Order, the Court found Belgravia represented to the arbitrator in the motion to abate that a delay was necessary so that, when the malpractice claims were ripe, Belgravia would litigate the compulsory counterclaims "alongside Stinson's fee claim." Mem. Op. and Order 11, Dkt. No. 49 (citing Mot. to Abate 7-8, Dkt. No. 4-6). These arguments seemed to the Court to be a concession that the malpractice claims fell within the scope of the arbitration provision. *See id.* at 12. Although the arbitrator ruled that Belgravia had not asserted

malpractice claims in the arbitration, the Court concluded "that Belgravia attempted to benefit from the arbitration agreement by asserting malpractice claims as compulsory counterclaims in the arbitration and arguing that the claims should be tried alongside the fee dispute." *Id.*

Plaintiffs challenge the Court's waiver ruling, arguing it erred in finding that they waived the right to litigate malpractice claims that did not yet exist. The Stinson Defendants counter that this Court's ruling was correct. They contend that Belgravia took the position that their malpractice claims should be adjudicated with the fee-dispute claims in the arbitration, and that they are switching their position now because of dissatisfaction with the arbitrator's rulings.

As Belgravia correctly argues, it requested a halt to the proceeding, not a submission of its malpractice claims to arbitration. The arbitrator agreed with the Stinson Defendants that Belgravia had not asserted malpractice claims in the arbitration. Nor did the arbitrator view Belgravia's motion as a request to add the counterclaims, as there is no ruling on that issue in the record. The arbitrator likewise did not mention untimeliness. While the Court did not misapprehend these facts in its initial decision, it misapprehended waiver law as applied to these pertinent facts. Notably, the Stinson Defendants first raised the waiver issue in their reply. The Court thus did not have before it a more developed record regarding the law on waiver and judicial estoppel, as it does now. Having considered waiver and judicial estoppel law more thoroughly, the Court concludes that it did not place enough weight on the fact that Belgravia never actually asserted the legal malpractice claims in the arbitration, believing them to be unripe, and did not succeed on their motion to abate. Those facts weigh against applying waiver or estoppel here.

"Waiver … 'is the intentional relinquishment or abandonment of a known right.'" *Morgan v. Sundance, Inc.*, 596 U.S. 411, 417 (2022) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). The right must exist, and the party must have knowledge of the right and an intention to

relinquish it. *Yates v. American Republics Corp.*, 163 F.2d 178, 179 (10th Cir. 1947). Waiver may occur expressly or impliedly, through "unequivocal and decisive acts or conduct of the party clearly evincing an intent to waive, or acts or conduct amounting to an estoppel on his part." *Id.* at 180. "To decide whether a waiver has occurred, the court focuses on the actions of the person who held the right; the court seldom considers the effects of those actions on the opposing party." *Morgan*, 596 U.S. at 417.

For the inverse question of whether a party waived the right to arbitrate by engaging in court litigation, the Tenth Circuit explained that there is no set rule as to what constitutes waiver. *See BOSC, Inc. v. Bd. of Cnty. Comm'rs of Cnty. of Bernalillo*, 853 F.3d 1165, 1170 (10th Cir. 2017). Instead, courts should consider a non-exhaustive, non-exclusive list of factors for guidance as to whether it is appropriate to deem a party to have waived a right, even when the party did not subjectively intend to do so. *Id.* Those factors are:

> (1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether "the litigation machinery has been substantially invoked" and the parties "were well into preparation of a lawsuit" before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) "whether important intervening steps [e.g., taking advantage of judicial discovery procedures not available in arbitration] had taken place"; and (6) whether the delay "affected, misled, or prejudiced" the opposing party.

*Id.* at 1170 (quoting *Peterson v. Shearson/American Express, Inc.*, 849 F.2d 464, 467-68 (10th Cir. 1988)) (hereinafter "the *Peterson* factors").

Turning first to express waiver, Belgravia in the motion to abate did not clearly and expressly consent to arbitrate the malpractice claims. Express waiver thus does not apply. This Court nevertheless determined that Belgravia's request to abate so that their malpractice claims could be adjudicated alongside the fee claims constituted an implied waiver. But the Court failed

to consider important factors that guide whether a party waived the right to litigate and did not place enough weight on the fact that the parties did not believe the claims were ripe at the time Belgravia moved to abate.[1] While Belgravia suggested in the motion to abate that it intended to assert the malpractice claims in the arbitration once they ripened, it did not *in fact* assert the malpractice claims. Its position at the time is therefore not clearly inconsistent with the right to litigate. Furthermore, because Belgravia did not assert the claims, Belgravia did not substantially invoke the arbitration machinery as to those claims. *Cf. G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 511 (Tex. 2015) ("A party's litigation conduct aimed at defending itself and minimizing its litigation expenses, rather than at taking advantage of the judicial forum, does not amount to substantial invocation of the judicial process."). Third, although Belgravia sought to abate the arbitration close to the hearing date, Belgravia has consistently argued that the malpractice claims were not ripe until the *PolyNatura* litigation concluded. Because of the ripeness questions, the delay in bringing the malpractice claims and in raising the issue of abatement before the arbitrator does not weigh in favor of waiver. Nor did Belgravia take advantage of arbitration procedures or submit the malpractice claims in the arbitration; the motion to abate was denied and the malpractice claims have not been considered part of the arbitration. The Court is also not convinced Defendants have been unduly prejudiced by Belgravia's conduct in the arbitration. Overall, the record does not show that Belgravia improperly manipulated the arbitration process.

For all these reasons, the Court erred in previously concluded that Belgravia intended to invoke the benefits of the arbitration agreement and waived its right to litigate the malpractice and

---

[1]In response to the motion to abate, the Stinson Defendants argued that the "illusory claims here certainly have not matured – Respondents cannot even identify what the claims are, let alone prove they have matured." Defs.' Ex. H at 10 n.2, Dkt. No. 34-2. The Stinson Defendants more recently asserted that "Plaintiffs were not precluded from asserting their malpractice claims timely in the arbitration," suggesting that the malpractice claims accrued when they knew of the claims, not when the underlying litigation concluded. *See* Resp. 12, Dkt. No. 59. This Court need not determine, however, when the malpractice claims accrued in deciding this motion to reconsider.

related claims. *Cf. BOSC*, 853 F.3d at 1174-75 ("We hold the Board did not waive its right to arbitrate. First, the Board took *some* actions inconsistent with its right to demand arbitration: it filed the state court action involving the claims it now seeks to arbitrate and further filed a response to the motion to dismiss. But it did not go so far as to voluntarily submit its claims to a court for relief as it refrained from serving [the opposing parties ] and further dismissed the case entirely before the district court could rule on the motion to dismiss."); *Armstrong v. Michaels Stores, Inc.*, 59 F.4th 1011, 1015-16 (9th Cir. 2023) (concluding that party had not waived right to arbitrate, despite party making limited discovery requests, because conduct did not evince a decision to take advantage of judicial forum and party did not actively litigate merits of case for prolonged period to take advantage of being in court); *G.T. Leach Builders*, 458 S.W.3d at 511 ("Although the acts of requesting and then agreeing to a new trial date could be inconsistent with an intent to exercise the right to arbitrate, they do not constitute an *express* waiver of that right.").

Belgravia's acts and conduct also do not warrant applying estoppel principles. Judicial estoppel prevents a party from asserting a claim in a legal proceeding that is contrary to a position taken in an earlier legal proceeding. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). Several factors inform whether to apply estoppel principles: (1) "a party's later position must be clearly inconsistent with its earlier position"; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 750-51 (internal quotations omitted). "Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations." *Id.* (internal quotations omitted).

As aforementioned, Belgravia's position in the motion to abate is not clearly inconsistent with their arguments for why the malpractice claims are not subject to arbitration. Second, Belgravia failed in persuading the arbitrator to accept its position. The arbitrator did not abate the proceeding, nor did the arbitrator consider the malpractice claims raised. The malpractice claims remain outside the arbitration. Consequently, the second factor does not favor applying estoppel principles. As for the third factor, Belgravia did not derive an unfair advantage from its position or impose an unfair detriment on the Stinson Defendants, so the third factor is not satisfied.

In its prior ruling, this Court relied on the case of *Lewis v. Circuit City Stores, Inc.*, 500 F.3d 1140, 1149 (10th Cir. 2007):

> The Tenth Circuit applies its usual rules regarding waiver and estoppel "to prevent a party from complaining about the enforceability of an arbitration agreement if he already has fully participated in arbitration without any relevant objection." This waiver rule "is important to advance the goals of arbitration as an efficient method of dispute resolution for which parties may contract in advance." The Tenth Circuit explained that it would be unjust to allow a party to voluntarily participate in the arbitration only to later challenge its legitimacy after getting unfavorable results.

Mem. Op. and Order 11, Dkt. No. 49 (internal citations omitted). The Court is no longer convinced that Belgravia either fully or substantially participated in the arbitration as to the malpractice claims, and thus, it finds *Lewis* distinguishable.[2]

The Stinson Defendants nonetheless argue that if Plaintiffs considered there to be an issue with the content of the arbitration agreement or concerning informed consent, they needed to raise that argument at the outset of the arbitration. *See* Resp. 10, Dkt. No. 59. But Plaintiffs' argument concerning informed consent did not relate to the fee claims, which they concede they agreed to arbitrate. Plaintiffs' informed consent argument applies to their malpractice claims, which they did

[2] For all these same reasons, the Court finds inapposite the other cases it previously relied upon, *Fortune, Alsweet and Eldridge, Inc. v. Daniel*, 724 F.2d 1355, 1356-57 (9th Cir. 1983), and *Damon v. StrucSure Home Warranty, LLC*, 2014-NMCA-116, ¶ 16, 338 P.3d 123.

not in fact assert in the arbitration and believed to be unripe until the *PolyNatura* Lawsuit ended. Engaging in arbitration of the fee-dispute claims did not waive their informed consent arguments as to their legal malpractice claims.

Because the Court misapprehended the controlling law as applied to the facts in this case, it reconsiders and overturns the portion of the *Order Compelling Arbitration* concluding that "the waiver and estoppel rules apply to preclude Belgravia from now arguing that their malpractice claims fall outside the scope of the arbitration agreement and that the arbitration agreement is invalid." Mem. Op. and Order 13, Dkt. No. 49. Accordingly, the Court must consider the arguments Belgravia raised in response to the Stinson Defendants' motion to compel arbitration that were left unresolved. The Court first turns to the issue of lack of informed consent.

**C. Plaintiffs' lack of informed consent regarding scope of arbitration agreement renders it unenforceable.**

The parties entered into a valid arbitration agreement, as evidenced by the fact that both parties participated in the arbitration as to the fee dispute. Nevertheless, Plaintiffs argue that an arbitration agreement waiving a client's right to litigate legal malpractice claims is unenforceable absent informed consent. According to Plaintiffs, Defendants had a duty to disclose the meaning and scope of the arbitration agreement to them, which they failed to do. The Court did not previously address this issue because of its waiver determination. In doing so now, the Court finds that, because full informed consent is lacking here, the Court erred in compelling arbitration of the legal malpractice and related claims.

The FAA makes an agreement to arbitrate in a contract evidencing a transaction involving commerce "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA favors arbitration, and it has created a body of federal substantive law establishing and regulating the duty to enforce arbitration

agreements. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985). Arbitration is strictly based on consent, not coercion. *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184 (2019). The parties' agreement controls the scope and procedures of the arbitration, and the task for a court is "to give effect to the intent of the parties." *Id.* (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010)). When the parties concede that they have agreed to arbitrate some claims, a court should resolve any doubts about the scope of arbitral issues in favor of arbitration. *Granite Rock Co. v. Int'l Broth. of Teamsters*, 561 U.S. 287, 298 (2010).

In this case, enforceability is a separate question from scope of the arbitration agreement because of the special attorney-client relationship involved. *See Castillo v. Arrieta*, 2016-NMCA-040, ¶¶ 14, 23, 368 P.3d 1249. The New Mexico Rules of Professional Conduct are "an expression of an attorney's fiduciary obligations of candor and loyalty to his client—an expression of public policy that can preclude enforcement of other transactions between attorney and client when those duties are violated." *Id.* ¶ 23. While New Mexico's Rules of Professional Conduct do not prohibit an attorney from entering into an agreement to arbitrate legal malpractice claims, the agreements are enforceable so long as "*the client is fully informed of the scope and effect of the agreement*." *Id.* ¶ 22 (emphasis in original) (quoting Rule 16-108(H) comm. cmt. 14 NMRA).

Because of the special trust relationship between the attorney and client, in New Mexico, "if an attorney is going to require his client, within the context of their relationship of trust, to waive the right to a jury trial for a future malpractice dispute, such a waiver should be made knowingly with the client's informed consent." *Id.* ¶ 23. Informed consent requires adequate communication about the "facts and circumstances giving rise to the situation, any explanation reasonably necessary to inform the client or other person of the material advantages and disadvantages of the proposed course of conduct and a discussion of the client's or other person's

options and alternatives." *Id.* (quoting *Spencer v. Barber*, 2013-NMSC-010, ¶ 34, 299 P.3d 388). "At a minimum, the attorney should inform his client that arbitration will constitute a waiver of important rights, including, the right to a jury trial, potentially the right to broad discovery, and the right to an appeal on the merits." *Id.*

The Stinson Defendants highlight that the arbitration clause expressly explained that mandatory binding arbitration resulted in waiving the right to jury trial. They note that the engagement letter further advised Plaintiffs that the "MANDATORY BINDING ARBITRATION OF ANY DISPUTES ABOUT OUR FEES OR OTHER CHARGES" results in the parties giving up "rights they would otherwise have to bring an action in court." Legal Services Contract, Dkt. No. 4-1 at 2 of 8. The letter said to "read this provision and the explanatory statement that accompanies it, and we advise you to seek separate counsel concerning whether you should agree to it. If you do not wish this provision to be a part of your agreement with us, please advise us before you sign this letter." *Id.* The accompanying statement further explained certain aspects of the arbitration process; advised again to seek independent counsel; said that the agreement waives the right to bring an action in court, to have a jury trial, and the right to appeal. *Id.* at 7 of 8. Because the arbitration agreement contained details about the rights that the client, a sophisticated business, was giving up, the Stinson Defendants contend that this case is distinguishable from *Castillo* and that the record shows that Plaintiffs gave informed consent. *See* Defs.' Reply 8 n.3, Dkt. No. 34.

It is true that, unlike in *Castillo*, the letter here advised the client about certain rights being waived – the right to discovery, the right to a jury trial, and the right to appeal – and recommended consulting separate counsel. But *Castillo* instructed that the client must be fully informed of the scope and effect of the agreement. That includes both the rights the client is waiving *and* an explicit disclosure of the nature of the claims covered by the arbitration clause. *See Castillo*, 2016-NMCA-

040, ¶ 24 ("Here, the text of the clause itself is no help. It declares in a single sentence only that client and attorney agree to submit any dispute to arbitration. We have already held that this is technically sufficient to apply to malpractice claims. However, it is not sufficient to inform the client of the material advantages and disadvantages of the proposed course of conduct.") (internal quotations omitted); *Hodges v. Reasonover*, 103 So.3d 1069, 1071 (La. 2012) ("An attorney must clearly explain *the precise types of disputes the arbitration clause is meant to cover* and must set forth, in plain language, those legal rights the parties will give up by agreeing to arbitration.") (emphasis added) (cited approvingly by *Castillo*, 2016-NMCA-040, ¶¶ 20-22).

Here, the letter did not adequately inform Belgravia that, by signing the agreement, they were waiving the rights to a jury trial, discovery, and appeal *as to future legal malpractice claims*. The first notification of the arbitration provision is under the title "Fees and Charges." Later, the arbitration clause is under the heading, "RESOLUTION OF DISPUTES CONCERNING FEES AND OTHER CHARGES." Although the arbitration agreement said it covered any claim related directly or indirectly to the fees or other charges, this language does not so plainly cover legal malpractice claims to satisfy the informed-consent requirements under the professional rules. Nor did counsel make it clear to Belgravia verbally that by signing the agreement, Belgravia waived the right to arbitrate a future malpractice or related suit. *See* Azodi Decl. ¶¶ 6-16, Dkt. No. 29-1. Because the arbitration clause arises out of the special attorney-client relationship, New Mexico requires more information from the attorney than what was given here. *Cf. Castillo*, 2016-NMCA-040, ¶ 24 ("If Plaintiff truly was never warned that he 'was waiving [his] right to a trial by jury' if he sued his attorneys *for malpractice*, as he stated in his affidavit, then inclusion of such a broadly worded and unexplained material term was an overreach by his attorneys that will not be enforced in this Court.") (emphasis added). *See also Snow v. Bernstein, Shur, Sawyer & Nelson, P.A.*, 176

A.3d 729, 737-38 (Me. 2017) ("To obtain the client's informed consent, the attorney must effectively communicate to the client that malpractice claims are covered under the agreement to arbitrate…."); *Hodges*, 103 So.3d at 1077 (explaining that attorney must explicitly disclose nature of claims covered by arbitration clause, such as fee disputes or malpractice claims); *Lawrence v. Walzer & Gabrielson*, 256 Cal. Rptr. 6, 9-10 (Cal. Ct. App. 1989) (concluding that client did not agree to binding arbitration of her claims of legal malpractice and breach of fiduciary duty because arbitration clause appeared to be limited to disputes concerning financial matters where it read, "In the event of a dispute between us regarding fees, costs or any other aspect of our attorney-client relationship, the dispute shall be resolved by binding arbitration").

As the Supreme Court of New Jersey explained in a similar case:

> [I]f this were an ordinary commercial contract, the term 'any dispute' is broad enough to encompass a dispute about whether the attorney committed legal malpractice. But again, we emphasize that the retainer agreement is not an ordinary contract and that the attorney has a fiduciary duty to make clear the retainer agreement's terms so that the meaning of those terms is readily apparent to the client. We can well imagine that an attorney might not be eager to discuss legal malpractice at the beginning of an attorney-client relationship, but if the retainer agreement intends to cover that potential scenario, then the attorney must directly and clearly address the subject.

*Delaney v. Dickey*, 242 A.3d 257, 276 (N.J. 2020) (internal citation omitted).

For the foregoing reasons, the arbitration agreement is not enforceable as to the legal malpractice and related claims as a matter of New Mexico public policy because of Plaintiffs' lack of informed consent. Moreover, because the provision does not comply with the New Mexico rules of professional conduct applicable to attorneys, it does not apply according to the terms of the arbitration agreement itself. *See* Legal Services Contract, Dkt. No. 4-1 at 7 of 8 ("THIS PROVISION SHALL NOT APPLY IN ANY JURISDICTION IN WHICH IT DOES NOT COMPLY WITH THE RULES OF PROFESSIONAL CONDUCT APPLICABLE TO

ATTORNEYS."). Consequently, the Court will grant the motion to reconsider as to its ruling compelling arbitration of the claims against the Stinson Defendants. Given this decision, the Court does not need to address Belgravia's alternative requests for relief.

**IT IS THEREFORE ORDERED** that Plaintiffs' *Motion for Reconsideration, or in the Alternative, for Clarification of the October 14, 2025 Order* (**Dkt. No. 56**) is **GRANTED** as follows:

1. The Court reconsiders and revokes its order referring Plaintiffs' claims against Defendants Stinson and Lackey to arbitration.
2. The Court reconsiders and revokes its order staying this action pending the conclusion of the arbitration proceedings.
3. Having reconsidered its prior Memorandum Opinion and Order (Dkt. No. 49), the Court **denies** the *Motion to Compel Arbitration and Stay Proceedings* (Dkt. No. 3), filed by Defendants Stinson and Lackey.
4. The Court hereby **lifts the stay** in this case.

SENIOR UNITED STATES DISTRICT JUDGE